UNITED STATES of America,
Plaintiff–Appellee,

v.

David Ronald CHANDLER, a/k/a Ronnie
Chandler, Defendant–Appellant.

Nos. 91–7466, 91–7577.

United States Court of Appeals,
Eleventh Circuit.

July 19, 1993.

As Modified Sept. 30, 1993.

Rehearing and Suggestion for
Rehearing En Banc Denied
Sept. 30, 1993.

L. Drew Redden, Birmingham, AL, Redden, Mills & Clark, Paul M. Dodyk, Cravath, Swaine & Moore, New York City, for defendant-appellant.

Frank W. Donaldson, U.S. Atty., Harwell G. Davis, Asst. U.S. Atty., Birmingham, AL, Robert J. Erickson, Deputy Chief, Appellate Section, Criminal Div., U.S. Dept. of Justice, Washington, DC, for plaintiff-appellee.

Before FAY, EDMONDSON and BIRCH, Circuit Judges.

BIRCH, Circuit Judge:

This appeal challenges the first death sentence imposed under the Anti–Drug Abuse Act of 1988, 21 U.S.C. § 848(e) *et seq.* The defendant Ronald David Chandler appeals both his conviction and sentence on the capital charge as well as his convictions and sentences on other related counts. We **VACATE** Chandler's conviction and sentence

for conspiracy. We **AFFIRM** all other convictions and sentences, including Chandler's death sentence.

## I. BACKGROUND

On May 8, 1990, Charles Ray Jarrell Sr. and Marlin Shuler drove to Snow's Lake in Piedmont, Alabama. At the lake, Jarrell and Shuler engaged in target practice with two pistols that Jarrell had brought along. Jarrell turned his gun at Shuler and then shot and killed him.

Later that year the State of Alabama indicted Jarrell, Jarrell's son Billy Joe, and Chandler for the murder of Shuler. These indictments were ultimately dismissed, but the state prosecutor handling those charges was appointed Special Assistant United States Attorney and assisted in this prosecution.

The United States issued a superseding indictment on January 9, 1991. Count One of the indictment charged Chandler, Jarrell and 14 other individuals with conspiracy to possess with intent to distribute and with distribution of over 1,000 kilograms of marijuana and 1,000 marijuana plants, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Chandler was also indicted on eight other counts: Count Two, engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848(a); Count Three, murder while engaged in and working in furtherance of a continuing criminal enterprise, in violation of 21 U.S.C. § 848(e); Counts Four and Five, aiding and abetting the use or carrying of a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and Counts Six, Seven, Eight, and Nine, money laundering in violation of 18 U.S.C. § 1956.

On January 17, 1991, Jarrell entered into a plea agreement with the government. Jarrell pleaded guilty to the conspiracy charge in Count One of the indictment and agreed to testify on behalf of the government at Chandler's trial. In exchange, Jarrell received immunity from prosecution for Shuler's murder from the State of Alabama and the United States.

On January 30, 1991, the government served notice, pursuant to 21 U.S.C. § 848(h)(1), of its intention to seek the death penalty against Chandler for the murder of Shuler under Count Three. The notice stated that the government would attempt to prove the following aggravating factors as the basis for the death penalty: (1) Chandler did intentionally kill Shuler; (2) Chandler did intentionally engage in conduct intending that Shuler be killed; (3) Chandler procured the murder of Shuler by payment and promise of payment of money; and (4) Chandler committed the murder after substantial planning and premeditation.

Chandler's trial was severed from the other co-conspirators' trials and commenced on March 19, 1991. The government's evidence consisted of over 40 witnesses, including a number of indicted and unindicted co-conspirators. Their testimony described the following events.

During the years of 1988 to 1990, Chandler developed an extensive marijuana growing and distribution operation that was centered in northeast Alabama, but operated in both Alabama and neighboring states. Chandler developed his supply of marijuana through the local farming of thousands of marijuana plants in northeast Alabama and the importation of marijuana from as far away as Texas. Chandler then used an extensive distribution network to generate substantial profits from his illegal activities. The profits were used in part to fund the growth of his operation and in part to purchase land and property.

The size of Chandler's operation was significant. In 1989 and again in 1990, Chandler helped prepare and cultivate over 100 plots of land dedicated solely to marijuana plants. In 1989, Chandler harvested most of the several thousand marijuana plants that were originally planted. In 1990, the harvest was disturbed by government raids that seized over 500 marijuana plants from Chandler's plots. In overseeing this operation, Chandler was not only actively involved in the cultivation of the plants, but he also hired several people to guard the plots during the growing season.

Chandler also arranged for supplies of marijuana from other locations, including a major source in Texas. In a four month

period in 1990, Chandler engaged Jarrell as a courier to import approximately 245 pounds of marijuana from Texas in four deliveries. A fifth delivery was thwarted when a different courier was arrested with $106,000. Chandler also obtained supplies of marijuana in neighboring states.

Chandler developed a distribution system of couriers and dealers to facilitate his sale of marijuana. On occasion, Chandler gave his couriers firearms to provide protection for his marijuana. It was a perceived threat to this dealer network that caused Chandler to resort to murder.

One of Chandler's dealers was Donna Shuler, the half-sister of both Chandler's wife and Jarrell. On March 2, 1990, state law enforcement officers executed a search warrant on Donna Shuler's home in Piedmont, Alabama, and uncovered several bags of marijuana totaling approximately one kilogram. The search warrant was based upon the affidavit of the local police chief. In the affidavit, the police chief stated that Shuler, the former husband of Donna Shuler, had complained on at least three occasions that Donna Shuler was dealing drugs from her home. Following the search, Donna Shuler was charged with drug trafficking.

Donna Shuler's attorney, Bill Broome, waived the formal preliminary hearing in exchange for the opportunity to look through the local district attorney's file, including the police report. On April 27, 1990, Broome made copies of the search warrant and the police chief's affidavit and supplied copies of them to Donna Shuler. A subsequent search of Chandler's residence on September 21, 1990, found a slip of paper which contained the words "Bill Broome" and "copy of police report."

Following the search of Donna Shuler's apartment, Chandler approached another of his dealers, Raymond Pointer, and asked him if he "was interested in making a little bit bigger money." RVII–75. Chandler told Pointer that he would pay him $5,000 to kill Shuler because Shuler "had gone and busted somebody in Piedmont." RVII–77. Chandler then opened a briefcase containing packets of hundred dollar bills and a nine millimeter pistol. Chandler also advised Pointer

that he would pay him even more money if Pointer would kill the Piedmont Chief of Police. Pointer, however, declined Chandler's offer.

On the morning of May 8, 1990, Chandler arrived at Jarrell's house. Also present at the house was Shuler. Upon seeing Shuler, Chandler warned Jarrell, "He's going to cause me and you a whole lot of trouble," and "You need to go on and take care of him and I still got that $500.00." RVII–10. Jarrell understood Chandler to be referring to a conversation Jarrell had with Chandler in January, 1990. In that conversation, which occurred before the search of Donna Shuler's home, Chandler announced that Jarrell should eliminate Shuler due to all of the problems that Shuler had caused for Jarrell and his family, declaring that he would pay Jarrell $500 if Jarrell accomplished the task. At that time, Jarrell thought that Chandler was joking.

Chandler then left Jarrell's house and Jarrell and Shuler spent the morning drinking heavily. The two then drove to Snow's Lake where they engaged in target practice with two guns Jarrell had brought: a .380 pistol owned by Jarrell and a nine millimeter pistol that Chandler had placed in Jarrell's car the previous evening. Jarrell then turned the nine millimeter pistol on Shuler, shot twice and killed him. Jarrell drove directly to Chandler's home and advised Chandler that he had killed Shuler. Jarrell then returned to Snow's Lake accompanied by Chandler, carried Shuler's body to the other side of the mountain bordering Snow's Lake, and buried the body near an abandoned moonshine still. Jarrell asked for the $500, but Chandler did not pay him.

At approximately the same time that Shuler was murdered, Chandler was also attempting to protect his operation from individuals who were stealing his marijuana crop. Chandler suspected that two individuals, Patrick Burrows and Jeffrey McFry, were stealing his marijuana. Chandler warned several people that he would kill McFry and Burrows if they continued to steal marijuana. Chandler later announced to one of his dealers that Burrows was dead and that McFry

would be next if McFry did not quit stealing Chandler's marijuana. Neither Burrows nor McFry were seen after September 1990.

The defense argued that while Chandler may have been involved in individual marijuana transactions, he was not involved in a conspiracy with the 16 other individuals as charged in the superseding indictment. Further, under no interpretation of the evidence was Chandler the head of a continuing criminal enterprise.

The defense also introduced evidence that there was a history of animosity between Jarrell and Shuler that gave Jarrell an independent reason to kill Shuler. Donna Shuler, the half-sister of Chandler's wife and Jarrell, was once married to Shuler. The couple lived for a time with Donna's mother. During their marriage Shuler repeatedly abused his wife and his mother-in-law. Jarrell and his sons frequently came to their defense and would argue and fight with Shuler. In 1989, during an argument between Shuler and Jarrell, Jarrell told Shuler that he was going to kill him, pointed a pistol at Shuler's head, and pulled the trigger. Although the gun was loaded, it failed to fire.

Defense counsel also attacked the putative gaps in the government's case. Chandler's counsel emphasized that a number of the government's key witnesses had entered into plea agreements in which testimony was exchanged for a recommendation of a lesser sentence.

On April 2, 1991, the jury found Chandler guilty on all nine counts. As provided under 21 U.S.C. § 848(i)(1)(A), the district court on the next day conducted a death penalty sentencing hearing before the same jury. The government resubmitted all of the evidence used at the guilt phase that was relevant to the death of Shuler or to the presence of aggravating or mitigating factors. The government and Chandler stipulated that Chandler had no prior convictions on any felony or drug charge and that state murder charges against Jarrell and Jarrell's son in connection with the Shuler murder had been dismissed and that neither the United States nor Alabama would prosecute either one for murder. Chandler's mother and wife testified for the defense.

Following detailed instructions from the district court, a unanimous jury found that the government had established two aggravating factors: (1) Chandler intentionally caused the death of Shuler and (2) Chandler procured the murder by promising the payment of money. The jury unanimously recommended that Chandler be sentenced to death. On May 14, 1991, the district court sentenced Chandler to life imprisonment on Counts One and Two, two consecutive five year sentences on Counts Four and Five, and six years of imprisonment on Counts Six, Seven, Eight and Nine. Based on the jury recommendation, the district court sentenced Chandler to death on Count Three as mandated by 21 U.S.C. § 848(*l*).

Chandler moved for a new trial as to both phases of his trial. These motions assigned numerous errors to both the guilt and sentencing phases of the trial. Some arguments renewed previous attacks and others were made for the first time. The district court denied the motions, but stayed enforcement of the capital sentence pending appeal. Chandler filed two appeals to this court. The first challenged the capital sentence under Count Three. The second contested his conviction on Count Three and his convictions and sentences on the non-capital counts. We consolidated the two appeals under 21 U.S.C. § 848(q)(1).

## II. THE STATUTORY SCHEME

### A. *Overview Of Section 848*

The Anti–Drug Abuse Act of 1988 establishes as a capital offense the intentional killing of a person in connection with the commission of a continuing criminal enterprise. The Act details procedures to be followed before a defendant may be sentenced to death.

Initially, the government must serve notice "a reasonable time before trial" of its intent to seek the death penalty. 21 U.S.C. § 848(h)(1). If a defendant is found guilty of violating Section 848(e)(1)(A), a separate sentencing hearing must be conducted, generally before the same jury that determined guilt. 21 U.S.C. § 848(i)(1)(A). The purpose of the

hearing is to permit consideration of any aggravating and mitigating factors relevant to whether the defendant should be sentenced to death. 21 U.S.C. § 848(j). The information presented at sentencing need not conform to the Federal Rules of Evidence, so long as the district court is convinced that its probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading to the jury. *Id.*

The process by which a jury is to consider sentencing factors is specific. The government must prove beyond a reasonable doubt and to the unanimous satisfaction of the jury at least two of the aggravating factors expressly set forth in the statute. 21 U.S.C. § 848(j), (k). It must advise the defendant a reasonable time before trial of those aggravating factors it intends to prove. 21 U.S.C. § 848(h)(1). One of these must be from among the four listed in Section 848(n)(1). The other must be from among those listed in Section 848(n)(2)–(12). Absent a finding of these aggravating factors, a jury cannot impose the death penalty. 21 U.S.C. § 848(k).

If a jury makes the required findings of aggravating factors, it then considers any mitigating factors established by the defendant. 21 U.S.C. § 848(k), (m). Mitigating factors need only be established by a preponderance of the evidence, and any juror persuaded of a mitigating factor may consider it in reaching a sentencing decision; unanimity as to what factors are mitigating is not required. 21 U.S.C. § 848(j), (k).

A jury that finds the required aggravating factors must consider whether these factors so outweigh any mitigating factors as to justify a sentence of death. 21 U.S.C. § 848(k). Absent any mitigating factors, a jury must still unanimously find that the aggravating factors are themselves sufficient to justify a sentence of death. *Id.* Invidious factors, such as race or sex, cannot influence a jury's recommendation of the death penalty. Each juror must sign a certificate attesting that neither the defendant's nor the victim's "race, color, religious beliefs, national origin, or sex" played any part in the deliberations. 21 U.S.C. § 848(*o*)(1).

Although a jury cannot vote for the death penalty absent the required findings just detailed, a jury is never *required* to impose a death sentence even if it finds sufficient grounds to do so under the applicable law. Indeed, a court must specifically so instruct the jury. 21 U.S.C. § 848(k). Although the statute denominates a jury's finding in favor of the death penalty a "recommendation," it is determinative, for upon such a "recommendation" the trial court "shall sentence the defendant to death." 21 U.S.C. § 848(*l*).

Appellate review of a death sentence is expressly provided by the statute. 21 U.S.C. § 848(q)(1). Such appeal may be consolidated with a challenge to the judgment of conviction, and the case is to be given priority on the appellate docket. *Id.*

## B. *Standard Of Review*

Section 848 contains two provisions that address our review of death sentences imposed under Section 848(e). Section 848(q)(2) states:

> On review of the sentence, the court of appeals shall consider the record, the evidence submitted during trial, the information submitted during the sentencing hearing, the procedures employed in the sentencing hearing, and the special findings returned under this section.

Section 848(q)(3) provides:

> The court shall affirm the sentence if it determines that—
>
> (A) the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor; and
>
> (B) the information supports the special finding of the existence of every aggravating factor upon which the sentence was based, together with, or the failure to find, any mitigating factors as set forth or allowed in this section.

There is nothing in these sections altering our ordinary standards of review. Instead, these sections serve to emphasize the serious nature of capital cases and the importance of careful review.

## III. DISCUSSION

### A. *Challenges To The Death Sentence*

#### 1. Jury power to recommend a sentence other than death

█ Section 848(k) provides that, if the jury finds certain aggravating factors, the jury must then weigh the aggravating factors against any mitigating factors to determine whether to recommend "that a sentence of death shall be imposed rather than a sentence of life imprisonment without possibility of release or some other lesser sentence." At Chandler's sentencing, the district court instructed the jury that, in the event that it did not recommend a sentence of death, it should not be concerned with the question of what sentence he might receive. The district court also stated that the judge alone would decide Chandler's sentence if the jury did not recommend death.

█ Chandler contends that the district court violated Section 848(k) as well as the Fifth and Eighth Amendments by withholding from the jury the authority to impose a sentence other than death. However, at a pre-sentencing hearing, Chandler's counsel asserted that "I don't think they [the jurors] make a recommendation of a sentence if they don't recommend death." XIV–40. The proposed jury instructions submitted by Chandler advised that, if the jury did not recommend a death sentence, the responsibility for imposition of a non-death sentence rested with the district court. Because Chandler both argued for and submitted jury instructions stating that the district court alone was responsible for sentencing Chandler if the jury did not recommend death, Chandler invited the alleged error and cannot now, on appeal, complain that the instruction was erroneous. *Leverett v. Spears,* 877 F.2d 921, 924 (11th Cir.1989).

█ Had Chandler not invited the instruction, the district court properly construed Section 848(k). When the language of a statute is clear, the language controls any interpretation of the statute absent a legislative intent to the contrary. *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *Harper v. Bet-*

*ter Business Servs., Inc.,* 961 F.2d 1561, 1563 (11th Cir.1992). We must look to the language and design of the statute as a whole in interpreting the language at issue. *McCarthy v. Bronson,* —— U.S. ——, ——, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991).

█ The language of Section 848(k) is not perfectly clear, and the legislative history of the Anti–Drug Abuse Act of 1988 consists of only a few debates on the Senate floor. Nevertheless, Section 848(k) can be confidently interpreted when it is read in the context of the statute as a whole. Several provisions of Section 848 suggest that Chandler's interpretation is flawed. Section 848(*l*) provides:

> Upon the recommendation that the sentence of death be imposed, the court shall sentence the defendant to death. Otherwise the court shall impose a sentence, other than death, authorized by law.

The second sentence of this section instructs that the district court determines the sentence if the jury does not recommend death. Similarly, Section 848(p) provides:

> If a person is convicted for an offense under subsection (e) of this section and the court does not impose the penalty of death, the court may impose a sentence of life imprisonment without the possibility of parole.

Thus, the statute grants the district court the discretion to sentence a defendant to life without parole if a death sentence is not recommended. These sections preclude an interpretation of Section 848(k) that gives the jury the authority to impose a non-death sentence. Correspondingly, the responsibility for sentencing has historically resided with the trial court. In the absence of clear language in a statute to lodge the sentencing responsibility with the jury, we are reluctant to interpret the statute in a strained manner to reach that result. Hence, we find that Section 848 grants the district court the power to sentence the defendant where the jury does not recommend death.

Chandler next insists that our interpretation of Section 848(k) violates the Fifth and Eighth Amendments. Chandler relies on *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). In *Beck,* the

Court held that a jury in a capital case must be permitted to consider a verdict of guilty on a lesser included non-capital offense where the evidence would support such a verdict. The jury will thus not be put in a position of choosing between guilt on a capital offense and acquittal. Chandler argues that the jury at his sentencing was put in a similar position.

However, *Beck* is not directly applicable in capital sentencing hearings. *California v. Ramos,* 463 U.S. 992, 1007–09, 103 S.Ct. 3446, 3457, 77 L.Ed.2d 1171 (1983). In Chandler's case, prior to sentencing the jury found Chandler guilty of murder in connection with a continuing criminal enterprise. Therefore, the jury was not choosing between guilt of a capital crime and acquittal. It was choosing between a penalty of death and some other sentence yet to be determined by the trial judge.

Chandler also invokes *Hicks v. Oklahoma,* 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980). In *Hicks,* the Court held that due process requires that a jury must be informed of all sentences that the statute allows it to impose when exercising sentencing power. *Id.* at 346, 100 S.Ct. at 2229. In *Hicks,* the jury was vested with the power to *determine* the defendant's sentence, capital or otherwise. In this case, *Hicks* provides no guidance. The issue before us is whether Section 848 gives the jury the power to *recommend* a sentence other than death. Unless that question is answered in the affirmative, *Hicks* provides no guidance.

■ The Court has ruled that there is no single correct way to structure a death sentencing procedure. *Morgan v. Illinois,* — U.S. —, —, 112 S.Ct. 2222, 2228, 119 L.Ed.2d 492 (1992); *Spaziano v. Florida,* 468 U.S. 447, 464, 104 S.Ct. 3154, 3164, 82 L.Ed.2d 340 (1984). Indeed, there is also no constitutional requirement that juries be allowed to participate in capital sentencing. *Id.* at 459, 104 S.Ct. at 3161–62. Accordingly, there is nothing unconstitutional with the procedure Congress established in Section 848. The jury has the sole power to recommend a sentence of death. If the jury does not recommend a death sentence, the trial judge has the responsibility to impose a sentence other than death. *Hicks* is inapplicable to Chandler's case because the jury, in this case, was instructed on the full range of its sentencing power; that is, the power to recommend a death sentence.

2. *Jury should have been informed of other sentences*

■ Chandler contends that even if the jury did not have the power to recommend a sentence other than death, under Section 848(k) and applicable precedent, the jury should have been informed of the possible sentences Chandler would face if the jury did not recommend death. We review jury instructions *de novo* to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party. *United States v. Myers,* 972 F.2d 1566, 1572 (11th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1813, 123 L.Ed.2d 445 (1993). The instructions must be viewed as a whole in the context of the trial record. *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Peek v. Kemp,* 784 F.2d 1479, 1492 n. 13 (11th Cir.1986), *cert. denied,* 479 U.S. 1047, 107 S.Ct. 912, 93 L.Ed.2d 862 (1987). Further, an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner. *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990); *see Estelle v. McGuire,* — U.S. —, —, 112 S.Ct. 475, 482 n. 4, 116 L.Ed.2d 385 (1991).

■ Initially, Chandler asserts that Section 848(k) requires that the jury be informed that he would face some other sentence, including the possibility of a life sentence without parole, if the jury did not recommend the death penalty. Section 848(k) instructs that after weighing the aggravating and mitigating factors and determining that the aggravating factors sufficiently outweigh the mitigating factors, the jury may then exercise its option to

> recommend that a sentence of death shall be imposed rather than a sentence of life imprisonment without possibility of release or some other lesser sentence.

At sentencing the district court instructed the jury:

> In deciding what recommendation to make, you are not to be concerned with the question of what sentence the defendant might receive in the event you determine not to recommend a death sentence. That is a matter for me to decide in the event you conclude that a sentence of death should not be recommended.

RXV–85. The district court also instructed:

> If you do not make such a recommendation, the court is required by law to impose a sentence other than death, which sentence is to be determined by the court alone.

RXV–87. Chandler's argument, in effect, is that the district court's instruction was inadequate because it did not inform the jury that the "sentence other than death" included the possibility of life without parole.

We find that the district court's instructions adequately informed the jury under Section 848(k). The statutory scheme created by Section 848 provides that the jury alone has the power to recommend a sentence of death. If the jury does not make such a recommendation, the district court sentences the defendant. Nothing in Section 848 requires the jury to be informed of what sentence the defendant might receive in the absence of death. The district court's instructions were proper.

■ Chandler also suggests that applicable precedent, mandating that a defendant be allowed to introduce evidence relating to mitigating factors, requires that the jury be informed of the possibility that Chandler would receive a life sentence without parole if death was not recommended. The Supreme Court has defined mitigating factors as "any aspect of a defendant's character or record and any of the circumstances of the offense." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978); *see Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 1670–71, 90 L.Ed.2d 1 (1986). The range of possible sentences that Chandler might receive in the event the jury did not recommend death does not fall within this definition. Accordingly, the district court was not required to inform the jury of the possible sentences Chandler might face.

### 3. Return of mitigating findings

■ Chandler urges us to rule that the district court should have required the jury to return written findings of mitigating factors it did or did not find to exist. At no time, however, did Chandler request that the jury be instructed to return written findings of mitigating factors or object to the lack of such an instruction. Chandler did submit proposed jury charges that instructed the jury that they should find two mitigating factors: (1) that Chandler lacked a criminal record, and (2) that an equally culpable defendant would not receive the death penalty. These requested instructions did not adequately bring to the district court's attention the issue now presented on appeal. Thus, we review for plain error. Fed.R.Crim.P. 52(b).

■ The finding of plain error is a three step process: (1) there must be an error, (2) the error must be plain, i.e. clear or obvious, and (3) the error must affect substantial rights. *United States v. Olano*, —— U.S. ——, ——, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993). In most cases, the third prong of this test is met only when the defendant demonstrates that the error affected the outcome of the proceedings before the district court. *Id.* at ——, 113 S.Ct. at 1778. If, however, the error affects the basic protections of a criminal trial without which a criminal trial cannot reliably serve its function, an effect on the outcome will be presumed. *Id.; see Arizona v. Fulminante*, 499 U.S. 279, ——, 111 S.Ct. 1246, 1264–65, 113 L.Ed.2d 302 (1991) (distinguishing between trial type errors and errors which undermine the entire trial). If the defendant satisfies all three prongs, then we have the discretionary power to correct an error which seriously affects the fairness, integrity or public reputation of judicial proceedings. *Olano*, —— U.S. at ——, 113 S.Ct. at 1778–79.

■ We first determine whether an error occurred. We disagree with Chandler's interpretation of Section 848 that the jury is required to return written findings of mitigating factors that the jury has either found to exist or found not to exist. Instead

we interpret Section 848 as providing the jury with the *option* of returning written findings of mitigating factors. Because the district court's instructions and verdict form foreclosed the jury's exercise of this option, the district court committed error.

Section 848(k) is entitled "Return of Findings." It provides that the jury "shall return special findings identifying any aggravating factors set forth in subsection (n) of this section, found to exist." The section also states:

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established for purposes of this subsection, regardless of the number of jurors who concur that the factor has been established.

The statute mentions special findings only in relation to aggravating factors. Also, the permissive language concerning the return of written mitigating factors, "may be made," contrasts with the mandatory language concerning the return of written aggravating findings, "shall." The jury is required to return aggravating findings and is permitted to return mitigating findings. Therefore, we find that Section 848 requires that the jury be instructed that it has the option to return written findings of mitigating factors if it so chooses, but that it does not require the return of such findings.

Section 848(q) does not require a different result. This section states that on review of a death sentence, "the court of appeals shall consider ... the special findings returned under this section." 21 U.S.C. § 848(q)(2). The section also instructs, in pertinent part, that we shall affirm a death sentence if

the information supports the special finding of the existence of every aggravating factor upon which the sentence was based, together with, or the failure to find, any mitigating factors as set forth or allowed in this section.

21 U.S.C. § 848(q)(3)(B). Neither of these subsections mandate the written findings of mitigating factors. They require only that we review any findings which are returned to

ensure that the information presented during sentencing supports those findings. We hold that Section 848(k) requires that the jury be given the option to return written findings of mitigating factors. Section 848(q)(3) requires that if the jury exercises its option, we must review those findings.

This interpretation comports with the law as it stood at the time Congress drafted the Anti–Drug Abuse Act of 1988. The finding of mitigating circumstances is individualized; a juror is free to find a mitigating factor even if no other juror agrees with that finding. *See Mills v. Maryland,* 486 U.S. 367, 373–74, 108 S.Ct. 1860, 1865, 100 L.Ed.2d 384 (1988). Congress may well have determined that forcing jurors to write down mitigating factors would discourage a lone juror from finding mitigating circumstances that the rest of the jury had rejected or disparaged. More significantly, by not requiring a juror to inform his or her fellow jurors of the mitigating factors that will be used in that juror's weighing calculus, the individualized determination of both mitigating factors and the appropriateness of a death sentence is protected.

■ The district court in this case did not inform the jury that it had the option to return written findings of mitigating factors and the verdict form did not contain space for the optional findings. This was error. Moreover, the error was plain. The statute, as we interpret it in this opinion, requires that the jury be given an option to return mitigating findings.

Accordingly, we must determine whether the error affected Chandler's substantial rights. We note initially that this error does not undermine the basic protections of a criminal trial without which a criminal trial cannot reliably serve its function, but instead is a trial type error. Chandler must therefore demonstrate that the error affected the outcome of the proceedings before the district court. Chandler argues that he was prejudiced because an appellate court on review cannot determine whether the jury found two mitigating factors which Chandler contends were beyond dispute: (1) that Chandler had no criminal record; and (2)

that Jarrell was an equally culpable person who would not receive the death penalty.

We are persuaded that the lack of written mitigating findings did not affect the outcome of Chandler's sentencing hearing. The government and Chandler stipulated that Chandler had no prior conviction on any felony or drug charge and that Jarrell would not receive the death penalty. These stipulations were presented at sentencing to the jury, and the jury was informed that they were stipulations. Moreover, the jury was properly instructed on how to find mitigating factors and the role of mitigating factors in their decision making process. The jury is presumed to follow the instructions they are given. *See Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987). Thus, Chandler has not demonstrated that the lack of written mitigating findings affected the outcome of his case.

In conclusion, the district court erred by not allowing the jury the option to return written findings of mitigating factors. However, this error did not affect the outcome of the sentencing hearing and was, therefore, not plain error.

### 4. Jury unanimity at sentencing

Section 848(k) provides that a recommendation of death may be returned only by the jury's unanimous vote. Section 848(*l* ) provides:

> Upon the recommendation that the sentence of death be imposed, the court shall sentence the defendant to death. Otherwise the court shall impose a sentence, other than death, authorized by law.

When read in conjunction, these subsections provide that in the event the jury cannot unanimously recommend a death sentence, the district court must sentence the defendant to some non-death sentence.

At sentencing, the district court instructed the jury that:

> [i]n order to bring back a verdict recommending the punishment of death, all twelve of you must vote in favor of recommending the death penalty. In other

words, a verdict recommending a sentence of death must be unanimous.

RXV–87. The jury was also charged:

> If you do not make such a recommendation, the court is required by law to impose a sentence other than death, which sentence is to be determined by the court alone.

RXV–87. The court ˙admonished the jury that it was never *required* to recommend a death sentence.

■ The district court provided the jury with a verdict form to complete during deliberations. The verdict form contained blanks for the jury to check after it made findings. In the section containing the jury's recommendation for or against a death sentence, the form provided:

> We the jury unanimously vote to recommend, and do unanimously recommend that
>
> ___a sentence of death *be imposed*
>
> ___a sentence of death *not be imposed*
>
> upon defendant David Ronald Chandler.

RII–221–3. Chandler argues that Section 848 along with the constitutional requirement that the jury not be misinformed or coerced during a capital sentencing require that the jury be instructed that the failure to reach unanimity would result in Chandler receiving some non-death sentence as determined by the court.

Several courts have held that a trial court must instruct the jury on the consequences of a lack of unanimity at the sentencing stage (a "hung" jury). The Delaware Supreme Court held that, because Delaware's capital statute provides that the failure to reach unanimity results in a life sentence, the jury must clearly and explicitly be instructed that the jury need not be unanimous for a life sentence to be imposed. *Whalen v. State*, 492 A.2d 552, 562 (Del.1985). The New Jersey Supreme Court, in construing a similar capital statute, held that the statute and the unique nature of a death case require that the trial court inform the jury of the consequences of a non-unanimous decision. *State v. Ramseur*, 106 N.J. 123, 524 A.2d 188, 283–84 (1987). Louisiana has reached the same conclusion. *State v. Williams*, 392 So.2d 619,

633–34 (La.1980). Chandler points out that in other Section 848(e) prosecutions, the district courts have instructed the jury on the consequences of a hung jury and provided a verdict form that allowed the jury to state that they were unable to reach a unanimous verdict.

Other courts, however, have held that a defendant is not entitled to an instruction informing the jury of the consequences of a lack of unanimity. The Fourth Circuit held that even though the Virginia capital statute requires that the defendant receive a life sentence if the jury is unable to reach unanimity, the defendant is not entitled to a hung jury instruction. *Evans v. Thompson,* 881 F.2d 117, 123–124 (4th Cir.1989), *cert. denied,* 497 U.S. 1010, 110 S.Ct. 3255, 111 L.Ed.2d 764 (1990). The Fourth Circuit also held that, although the South Carolina capital statute requires an instruction on the consequences of a hung jury, the lack of such an instruction has no affect on the sentencing decision. *Gaskins v. McKellar,* 916 F.2d 941, 955 (4th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991). North Carolina, Florida and Alabama do not require the jury to be informed of the effect of a failure to reach a unanimous verdict. *Barfield v. Harris,* 540 F.Supp. 451, 472 (E.D.N.C.1982). *See also Aldridge v. State,* 351 So.2d 942, 944 (Fla.1977) (per curiam); *Coulter v. State,* 438 So.2d 336, 346 (Ala.App. 1982) (collecting cases).

We find the reasoning of the second set of authorities persuasive and hold that the district court is not required to instruct the jury on the consequence of the jury's inability to reach a unanimous verdict. There is no requirement that instructions to the jury duplicate the statutory language. Section 848(*l*) is an instruction to the court and not for the jury. Our holding is further supported by the general interest the criminal justice system has in unanimous verdicts. Asking the jury to return a unanimous verdict forces jurors to examine their views on the case and engage in discussions and deliberations as they attempt to resolve their differences.

We reject the suggestion that the instructions or verdict form in some way coerced the jury into a recommendation of death. Similar instructions are given during the guilt stage of criminal proceedings. That an *Allen* type charge was given in the present case does not create any coercion.[1] Although the instruction stated that jurors should "not hesitate to re-examine your own opinion, and to change your mind if you become convinced that you are wrong," it also admonished, "do not give up you honest beliefs ... solely because the others think differently or merely to get the case over with." RXV–87. When this instruction is coupled with the court's statement that Chandler would receive the death penalty only if all jurors unanimously agreed to recommend death, we conclude the *Allen* charge was not coercive. *See Lowenfield v. Phelps,* 484 U.S. 231, 237–238, 108 S.Ct. 546, 550–51, 98 L.Ed.2d 568 (1988).

Finally we note that unlike many of the coercion cases discussed here and in Chandler's brief, there was no indication in this case that the jury was anything but unanimous. After a two week trial, the jury deliberated for just under three hours before returning a recommendation of death. Moreover, each juror was required to sign the verdict form and each juror, when polled, affirmed the decision.

To conclude, we hold that in the sentencing phase of a Section 848(e) prosecution, the district court is not required to instruct the jury on the consequences of an inability to reach a unanimous verdict. Chandler also failed to demonstrate that the jury was in any way coerced in this case.

### 5. Propriety of the evidence at sentencing

Section 848 establishes a procedure for the introduction of evidence at the sentencing phase. Before trial, the government must provide the defendant with a list setting forth each aggravating factor that the government will attempt to prove as a basis for the imposition of the death penalty. 21 U.S.C.

---

**1.** An *Allen* charge derives its name from *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

§ 848(h)(1)(B). At the sentencing hearing, the government may present information relevant to any of the aggravating factors set forth in the Section 848(h)(1)(B) list as long as the probative value of the information is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. 21 U.S.C. § 848(j).

Prior to trial, the government provided a list to Chandler of the three aggravating factors on which it would rely in seeking the death penalty. The three factors were: (1) Chandler did intentionally kill or intentionally engage in conduct intending the killing of Marlin Shuler, Section 848(n)(1); (2) Chandler procured the murder of Shuler by promise of payment of money, (n)(6); and (3) Chandler committed the murder after substantial planning and premeditation, (n)(8).

At the guilt phase, the government introduced evidence that Chandler had made threats against McFry and Burrows because he thought they were stealing his marijuana and that the two had not been seen since the threats were made. Prior to the sentencing hearing, Chandler submitted proposed jury instructions. Proposed Instruction 14 stated that it would be inappropriate for the jury to speculate on what may have happened to McFry and Burrows or what connection Chandler may have had with them. Proposed Instruction 15 stated that the jury may consider evidence relating only to Marlin Shuler and to Count Three of the indictment. Prior to the hearing, the district court, the prosecution, and Chandler's attorney discussed these proposed charges. The district court indicated that it thought that the charges unduly limited the evidence that the jury could consider because most of the evidence presented at the guilt phase was relevant to either Chandler's intent or to the planning or scheming of Shuler's murder. Then, in response to a question from the prosecution, the court opined that any evidence concerning the disappearance of either McFry or Burrows was relevant to planning, if nothing else. Later, the court advised that although he would not give Chandler's proposed instructions, he thought they were fair arguments for Chandler's counsel to make in closing.

At the hearing, the district court received, upon the government's submission, all of the testimony, evidence, and exhibits presented at the guilt phase that were relevant to the murder of Shuler or to the presence of aggravating or mitigating factors. Chandler's counsel, in his closing argument to the jury, requested that it should not speculate about any connection between Chandler and the disappearances of McFry and Burrows. The prosecution replied in rebuttal that the threats made against McFry and Burrows demonstrated planning in the protection of Chandler's marijuana operation. Following closing arguments, the court instructed the jury that it could consider any evidence relevant to the Shuler murder and to the existence of aggravating and mitigating factors. The court identified the specific factors that the government was attempting to prove and admonished the jury to consider no other aggravating factor.

On appeal, Chandler argues that the introduction of all the evidence from the guilt stage of the proceedings coupled with the argument made in closing by the government relating to McFry and Burrows constituted an attempt by the government to use the apparent murders of McFry and Burrows as aggravating factors. Since these putative murders were not included in the list provided under Section 848(h)(1)(B), Chandler insists that the sentence of death should be vacated.

■ The evidence relating to McFry and Burrows was properly admitted during sentencing because it related to the aggravating factors the prosecution was responsible for proving. Section 848(j) allows the presentation of any information relevant to aggravating circumstances provided the probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. Although the Federal Rules of Evidence do not govern the admissibility of evidence during a Section 848(e) sentencing hearing it is helpful to refer to the definition of relevant evidence from the Federal Rules, to wit: evidence having any tendency to make the existence of a material fact more probable or less probable

than it would be without the evidence. Fed. R.Evid. 401.

■ The evidence concerning McFry and Burrows has a tendency to prove Chandler's intent to kill Shuler and his substantial planning in the murder. The fact that Chandler threatened to eliminate two individuals who he believed were stealing his marijuana tends to prove that Chandler was willing to harm someone who threatened his marijuana enterprise. Since Shuler threatened Chandler's operation by informing on Donna Shuler, Chandler's prior threats and the disappearances have a tendency to prove that Chandler would also respond to Shuler's actions to protect his operation. This has a tendency to prove that Chandler intended to harm Shuler.

The evidence also demonstrates that Chandler planned the protection of his marijuana operation. Public statements indicating that Burrows is dead and McFry will be next, reveal Chandler's conscious actions over time to protect his operation. That Chandler planned the protection of his operation against those who threatened it has some tendency to prove that Chandler would plan a reprisal against Shuler for informing.

■ We conclude that the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. The evidence concerning McFry and Burrows was properly admitted at the guilt phase of trial,[2] so the jury had previously considered the evidence. The district court instructed the jury that it could only weigh the evidence as it related to the three aggravating factors and that only those three factors could serve as the basis for imposition of a death sentence. Therefore, the evidence was not erroneously admitted during the sentencing hearing.

6. Instruction on the weighing process

■ Following the jury's finding of aggravating and mitigating factors, Section 848(k) provides that the jury "shall then consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death." Chandler assigns error to the district court's failure to instruct the jury that it was required to find that the aggravating circumstances sufficiently outweighed any mitigating factors either beyond a reasonable doubt or by clear and convincing evidence. Chandler contends that because the possible punishment under Section 848 is the death penalty, the weighing process must be interpreted to require a heightened burden of proof.

The clear language of a statute controls any interpretation of the statute absent a clearly expressed legislative intent to the contrary. In this case, the language of Section 848(k) is clear and the meager legislative history is not to the contrary. The statute states that the jury must consider whether the aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death or if no mitigating factors exist whether the aggravating factors are themselves sufficient to justify a sentence of death. There is no language suggesting that the weighing process is governed by a burden of proof. Congress obviously knew how to assign burdens of proof to jury findings; it did so in Section 848(j) for findings of aggravating factors (beyond a reasonable doubt) and mitigating factors (by a preponderance of the evidence). If Congress had intended to govern the jury's weighing process with a burden of proof, it could have done so. It did not, and we will not construe the statute to require one.

■ That the jury need only be instructed that the aggravating factors sufficiently outweigh the mitigating factors is entirely appropriate. A capital sentencing scheme is constitutional even if it does not require that a specific burden of proof govern the jury's weighing process. *Ford v. Strickland,* 696 F.2d 804, 817–818 (11th Cir.) (en banc), *cert. denied,* 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983). The Supreme Court has also observed, "we have never held that a specific method for balancing mitigating and

2. *See infra* part III.C.1.

aggravating factors in a capital sentencing proceeding is constitutionally required." *Franklin v. Lynaugh,* 487 U.S. 164, 179, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988) (plurality); *see Zant v. Stephens,* 462 U.S. 862, 875 n. 13, 103 S.Ct. 2733, 2742 n. 13, 77 L.Ed.2d 235 (1983). Congress created a constitutional capital sentencing scheme by requiring the jury to find that the aggravating factors sufficiently outweigh the mitigating factors before a death sentence could be recommended.

Alternatively, Chandler submits that even if the statute does not require a burden of proof in the weighing process, the district court erred in its instructions to the jury. The district court instructed the jury both at the beginning of the sentencing hearing, the preliminary instructions, and again at the conclusion, the supplemental jury instructions. On each occasion the district court provided the jury with a copy of the instructions that the district court requested the jury follow as the instructions were read aloud. Both the preliminary and the supplemental instructions discussed the weighing process five times. Three of those times the district court instructed that the aggravating factors must sufficiently outweigh the mitigating factors. Twice the district court instructed that the aggravating factors must outweigh the mitigating factors. The district court also gave the jury a verdict form. The form was to be signed by each juror and confirmed that the jury had found that the aggravating factors sufficiently outweighed the mitigating factors.

■ We review jury instructions under the standard discussed above.[3] In context, the instructions sufficiently charged the jury on the weighing process. The instructions communicated to the jury that it must find that the aggravating factors when balanced against the mitigating factors justified a sentence of death. The fact that the district court omitted the word "sufficiently" two times does not render the instructions inadequate or erroneous. Moreover, the jury form that each juror signed stated that "the aggravating factors unanimously found by us to exist *sufficiently* outweigh any mitigating

factor or factors found to exist to justify a sentence of death." RII–221–3 (emphasis added).

### 7. The weighing process

■ A death penalty statute is constitutional only if the statue genuinely narrows the class of persons eligible for the death penalty and reasonably justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder. *Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988) (citing *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983)).

Chandler argues that due to the breadth of 848(e), the finding of guilt under Section 848(e) does not satisfy the constitutional requirement that a capital statute must genuinely narrow the class of defendants eligible for the death penalty. Instead, Chandler contends that the narrowing function occurs during the sentencing phase when the jury finds aggravating factors. Chandler further contends that because one of the aggravating factors duplicates a jury finding at the guilt phase, the jury's weighing process is skewed in favor of imposing the death penalty. He submits that the jury's deliberations are skewed because the jury will inevitably consider the number of aggravating factors during its weighing process.

■ Section 848 establishes a two-step scheme that guides the jury's deliberations. At the guilt phase, the jury determines whether the defendant intentionally killed or commanded or procured the intentional killing of an individual while engaging in or working in furtherance of a continuing criminal enterprise. Before the death penalty can be recommended, the jury at sentencing must first unanimously find that the government has proved beyond a reasonable doubt the existence of aggravating factor (n)(1) and at least one other aggravating factor from the list in (n)(2) through (n)(12). Aggravating factor (n)(1) mirrors the intent element found at the guilt phase. The jury then considers whether the aggravating factors

---

3. *See supra* part III.A.2.

sufficiently outweigh any mitigating factors to justify a sentence of death. If no mitigating factors are found, the jury considers whether the aggravating factors are sufficient to justify a sentence of death.

 As long as a death penalty statute narrows the class of persons subject to the death penalty at the guilt phase of trial, the fact that the jury may find an aggravating factor that duplicates a finding made at the guilt phase does not render the capital statute unconstitutional. *Lowenfield,* 484 U.S. at 246, 108 S.Ct. at 555. The statutory scheme of Section 848 satisfies the requirements of *Lowenfield.*[4] Initially, the statute requires the jury to find that the defendant intentionally committed homicide in connection with large scale drug trafficking. The statute does not embrace anyone who committed murder, but only those who did so in connection with a continuing criminal enterprise. Thus, Section 848(e) sufficiently narrows the class of death eligible defendants at the guilt phase. Moreover, Section 848 requires that the jury find at least one other aggravating factor from the list of (n)(2)–(n)(12) before the death penalty can be imposed. The statute also requires the jury to consider any mitigating circumstances and allows the jury to weigh the aggravating and mitigating factors. This is all that *Lowenfield* requires.

 Nevertheless, Chandler suggests that the present case is distinguishable from *Lowenfield* because Section 848(e) requires the jury to weigh the factors while the statute in *Lowenfield* did not. Chandler posits that the jury will be influenced in its weighing process by the number of aggravating factors. Although the Supreme Court has observed that the difference between a weighing statute and a non-weighing statute is "not one of 'semantics' ", *Stringer v. Black,*

—— U.S. ——, ——, 112 S.Ct. 1130, 1137, 117 L.Ed.2d 367 (1992), we have previously rejected the kind of argument Chandler now makes. *Johnson v. Singletary,* 991 F.2d 663, 669 (11th Cir.1993) (per curiam). Further, any such distinction was erased by the district court's instructions. The court's instructions made clear that the weighing process was not a mechanical one and that different factors could be given different weight. Thus, the jury was adequately instructed that it should not reach a decision based on the number of aggravating or mitigating factors. Accordingly, the scheme of Section 848(e) was not improperly skewed towards a sentence of death.

### 8. Prosecutor's closing arguments

 Chandler argues that the prosecutor made four improper remarks during closing argument at the sentencing hearing. We apply a two-step test to determine if prosecutorial misconduct occurred: (1) the remarks must be improper and (2) the remarks must prejudicially affect the substantial rights of the defendant. *United States v. Eyster,* 948 F.2d 1196, 1206 (11th Cir.1991). We find that the statements were proper and do not reach the second prong of the test.

#### a. *Improper vouching*

Following Shuler's murder, the police arrested Jarrell and his son, Billy Joe Jarrell. After Jarrell admitted to having killed Shuler, Billy Joe was released and the murder charges against him were dismissed. Jarrell entered into a plea agreement and testified for the government against Chandler. Both Billy Joe and Jarrell testified at Chandler's trial. Billy Joe denied involvement in Shuler's murder. At sentencing the parties stipulated that the murder charges against Jarrell and Billy Joe Jarrell had been or would be dismissed. Defense counsel then argued

4. In *Lowenfield,* the jury, in convicting the defendant for first degree murder, found that the defendant had the specific intent to kill or to inflict great bodily harm upon more than one person. At sentencing, the jury then found, as the sole aggravating factor, that the defendant had knowingly created a risk of death or great bodily harm to more than one person. The Supreme Court determined that the statute narrowed the class of death eligible defendants at the guilt phase by

narrowing the definition of a capital offense. *Id.* The Court found that a capital statute is constitutional if it narrows the class of death eligible defendants at the guilt phase and at sentencing allows for the consideration of mitigating circumstances and the exercise of discretion. *Id.* The fact that an aggravating factor in such a scheme duplicates the jury's finding at the guilt phase was not dispositive.

to the jury that the Jarrells had an independent motive to kill Shuler; that is, Shuler's abuse of Donna Shuler, Jarrell's half-sister.

Chandler contends that the prosecutor improperly vouched for the credibility of Billy Joe by alluding to evidence not before the jury. Chandler's counsel argued that the Jarrells were culpable for Shuler's death:

> Well here's one thing that is undisputed. There was Jarrell's family's malice toward Marlin Shuler. How is that demonstrated. No question about the fights that both sons, Charles Ray, Jr., Billy Joe had with Shuler. Why. Because of, number one, his abuse of Donna Shuler, Charles Ray's half sister, abuse of her, his abuse of the family generally and his abuse of Donna's mother, Mrs. Johnson, for whom he had an abhorrious name.

RXV–60. Counsel went on to argue, by alluding to the Jarrells, that a mitigating factor in this case was

> that another defendant or defendants equally culpable in the crime will not be punished by death. You can go further than that, not be punished at all, will not even be tried under an accusation of the murder of Marlin Shuler.

RXV–61.

In rebuttal the government argued that Charles Ray Jarrell was not as equally culpable as Chandler and then stated:

> Billy Joe Jarrell, there's a stipulation about his case being dismissed. That is absolutely correct. His case was dismissed for lack of evidence, for lack of evidence. And if you can find, ladies and gentlemen, from the evidence that you've heard in this trial that Billy Joe Jarrell is guilty of complicity in that murder whatsoever and can convince someone of that, me or Mr. Davis, then I'm sure that case will be brought up again.

RXV–73. Chandler objected to this argument.

■ A prosecutor's remarks are improper if they attempt to bolster the credibility of a witness based on the government's reputation or by alluding to evidence not formally before the jury. *Eyster*, 948 F.2d at 1206. Chandler argues that there was no evidence

before the jury that the case against Billy Joe was dismissed for lack of evidence and, thus, the government's argument to that effect was improper. We disagree. Both parties stipulated that the charges against Billy Joe had been dismissed. A firearms expert testified at Chandler's trial that in his opinion the gun found on Billy Joe when he was arrested could not have fired the shots that killed Shuler. A police officer also testified that his investigation indicated that Billy Joe had not been involved in Shuler's murder. Therefore, there was sufficient evidentiary support for the prosecutor's argument.

### b. Failure to testify

Chandler also contends that the government improperly commented on Chandler's failure to testify and, therefore, violated Chandler's privilege against self-incrimination. In arguing that Jarrell was less culpable than Chandler, the prosecution asserted:

> You've heard several times that in return for his cooperation in this case the government, the United States government and the State of Alabama have agreed to recommend a 25–year sentence without parole for Charles Ray Jarrell....
>
> Now, the defendant will no doubt argue this simply is not somehow not [sic] fair. Charles Ray Jarrell came here before you and testified before you. You were able to hear his testimony. He came in here, admitted what he did, came in here and told you what he did, what kind of person he is and isn't anything to write home about, there is no question about that. But I submit to you that a man that was willing to solicit two different prospective killers on at least three different occasions, a man who was willing to provide money to people to perform the act, a man who was willing to provide weapons to complete the act and a man who is cunning and manipulative is a far more dangerous individual than a self-confessed town drunk living hand to mouth who allows himself to be manipulated into actually doing this terrible act.

RXV–56–57.

■ A prosecutor's statement improperly comments on a defendant's right not to testi-

fy if, when taken in the context in which the statement was made, it was manifestly intended, or was of such a character, that a jury naturally and necessarily would take it to be a comment on the failure of the accused to testify. *United States v. Herring*, 955 F.2d 703, 709 (11th Cir.1992).

■ Viewed in the context in which the statement was made, we find that the prosecutor's statement was not improper. A common sense reading of the statement suggests that the prosecutor was arguing that Jarrell was not as culpable as Chandler. The argument was based, not on Chandler's failure to testify, but on the facts elicited from Jarrell's testimony. A jury would not naturally take the argument to be a comment on Chandler's failure to testify, nor is it obvious that the remark was so intended.

### c. Shifting of responsibility

The prosecutor also argued:

Now, you say you ask me to kill Ronnie Chandler. No, I don't ask you to do that. If you recommend the death sentence, Ronnie Chandler is killing himself by his actions. But if you do recommend the death penalty, the death penalty will be imposed by a judicial process where there was due process in an open proceeding where a jury had an opportunity to hear all of the evidence and decide what should be done with Ronnie Chandler.

RXV–74. The prosecutor also stated that recommending the death penalty is a form of self defense for society.

■ Chandler contends that these arguments are improper because they undermined the jury's sense of responsibility in recommending a death sentence, relying on *Caldwell v. Mississippi*, 472 U.S. 320, 328–29, 105 S.Ct. 2633, 2637, 2639, 86 L.Ed.2d 231 (1985) and *Buttrum v. Black*, 721 F.Supp. 1268, 1316–17 (N.D.Ga.1989). We disagree. The argument made here is not similar to those made in *Caldwell* and *Buttrum*. In this case, the prosecution emphasized that the jury was responsible for evaluating the evidence and determining whether Chandler's actions merited a death sentence. The argument does not in any manner attempt to dilute the jury's sense of responsibility. It urges the opposite. We also note that a prosecutor may argue that the death penalty serves as a deterrent. *Davis v. Kemp*, 829 F.2d 1522, 1528 (11th Cir.1987), *cert. denied*, 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988); *Drake v. Kemp*, 762 F.2d 1449, 1459–60 (11th Cir.1985) (en banc), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986). We conclude that the prosecutor's statements were proper.

### d. Argument against sympathy

■ Chandler also contends that the government's argument that the jury should show no sympathy towards Chandler or his family amounted to prosecutorial misconduct. In prior habeas cases, we have found that it is improper for prosecutors to argue that mercy is *per se* inappropriate for the jury to consider in deliberating on a death sentence. *Wilson v. Kemp*, 777 F.2d 621, 626 (11th Cir.1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986); *Drake v. Kemp*, 762 F.2d at 1460. However, a prosecutor may properly argue that under the facts of the offense and the character and history of a particular defendant, the jury should not extend mercy to that defendant. *Wilson*, 777 F.2d at 626.

In the present case, the prosecutor properly argued that, because of the facts of this specific criminal activity, the jury should not base their decision of whether to sentence Chandler to death on any sympathy they might feel towards Chandler or his family. The argument was not improper.

### 9. Future execution and the *Ex Post Facto* clause

■ At the present time, there is no federal statute prescribing a method for carrying out federal death sentences. Chandler contends that any future Congressional legislation specifying a method of execution would have retroactive effect in violation of the *ex post facto* clause. U.S. Const. art. 1, § 9, cl. 3. In effect, Chandler argues that his current sentence is life imprisonment under a

sentence of death. Once Congress acts, the punishment would increase to death.

The *ex post facto* clause prohibits any statute "which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed." *Collins v. Youngblood,* 497 U.S. 37, 42, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990) (quoting *Beazell v. Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 68–69, 70 L.Ed. 216 (1925)). The clause does not prohibit a law that changes a statute's procedure, but does not affect matters of substance. *Dobbert v. Florida,* 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977) (new Florida capital statute that cured constitutional defects in old capital statute by amending the death sentencing procedure, but not the "quantum of punishment attached to the crime," did not violate *ex post facto* clause).

Chandler's attack is foreclosed by *Dobbert.* The statute under which Chandler was sentenced to death clearly provided for such a sentence, so there was clear notice that a violator of the law might be sentenced to death. Future legislation would not increase the punishment, but would only provide for the method by which the punishment would be carried out; a change in procedure, not the sentence. Congressional legislation prescribing the method of execution would thus not increase the punishment imposed on Chandler.

### 10. The sentence

■ Chandler also complains that his present situation, in which he faces a death sentence without knowing when or how that sentence will be carried out, is cruel and unusual punishment in violation of the Eighth Amendment. Chandler relies on *In re Medley,* 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835 (1890). In *Medley,* a defendant was convicted and sentenced under a state capital statute that became effective after the commission of the murder. The new statute amended the previous capital statute in part by requiring a convicted defendant to be held in solitary confinement until execution, allowing the warden to fix the date of execution, and mandating that the prisoner be kept in ignorance of his execution date. The Supreme Court held that the new statute violated the *ex post facto* clause because it increased the defendant's punishment.

Because the Court's decision rested on *ex post facto* grounds, it provides no support for Chandler's arguments that his current situation is cruel and unusual punishment. We see no reason that his current sentence is unconstitutional. The majority of convicted murderers on death row do not know when they will be executed because of the lengthy appeal process as well as other reasons. Chandler's situation is no different from these individuals, or for that matter from most other people who do not know when their lives will end or in what manner.

### B. Challenges To The Conviction On Count Three

Count Three of the indictment charged Chandler with the murder of Shuler while engaged in and working in furtherance of a continuing criminal enterprise in violation of 21 U.S.C. § 848(e). Chandler contends on several grounds that his conviction on this count was improper.

#### 1. Connection between the continuing criminal enterprise and the murder

■ Section 848(e)(1)(A) states that any person engaging in or working in furtherance of a continuing criminal enterprise ... who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

The government and Chandler agree that Section 848(e) requires a connection between the underlying continuing criminal enterprise and Shuler's murder in order for the Chandler to be convicted under this statute. Chandler contends, however, that his conviction should be reversed because the indict-

ment failed to allege, and the district court's instructions did not require the jury to find, a connection between the murder and the enterprise. Chandler posits that these defects allowed the jury to return a guilty verdict based upon a finding that Chandler was involved in Shuler's murder contemporaneously with his involvement in the criminal enterprise even if the murder was unrelated to the enterprise. Chandler contends that the jury could have found that Chandler solicited Shuler's death because of Shuler's abusive treatment of his family, yet still return a guilty verdict on Count Three.

### a. The indictment

The indictment charged in Count Three that Chandler:

> while engaged in and working in furtherance of a continuing criminal enterprise, intentionally killed and counseled, commanded, induced, procured and caused the intentional killing of Marlin Shuler, and such killing resulted, in violation of Title 21, United States Code, Section 848(e)(1)(A), and Title 18 United States Code, Section 2.

RII–221–Court Exhibit No. 1–12.

■ The indictment was sufficient because it did require a nexus between the enterprise and the murder of Shuler. An indictment may track the language of the statute "as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.'" *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *United States v. Ramos,* 666 F.2d 469, 474 (11th Cir.1982).

The language of the indictment is sufficient. The indictment tracks the language of the statute as written by Congress. Moreover, any reasonable reading of the indictment makes it clear that the government was charging Chandler with a murder in connection with, and not just contemporaneous to, the ongoing continuing criminal enterprise. The necessary connection between the mur-

der and the enterprise was thus present in the indictment.

### b. Jury charge

The instruction given by the district court to the jury stated,

> "So count 3 is built upon count 2, which it is built upon count 1. Then goes on and charges on or about May 8, 1990 in or about an area known as Snow's Lake near Piedmont, Alabama in the Northern District of Alabama, the defendant ... while engaged in and working in furtherance of a Continuing Criminal Enterprise, intentionally killed and counseled, commanded, induced, procured and caused the intentional killing of Marlin Shuler....

RXIII–186. The district court further instructed that "Section 848(e)(1) make[s] it a separate Federal crime or offense for anyone, while engaging [in] a Continuing Criminal Enterprise such as the one charged in count 2, to kill an individual or to command or cause the intentional killing of an individual." *Id.* at 187. The court then enumerated the elements in a Section 848(e)(1) offense:

> First, that while engaging in or working in furtherance of the Continuing Criminal Enterprise charged in court 2, the defendant either killed Marlin Shuler or commanded, induced, procured or caused the intentional killing of Marlin Shuler, as charged in count 3 and (2), that the death of Marlin Shuler resulted from such activity of the defendant and, (3), that such activity of the defendant was done knowingly and willfully.

*Id.* Again, Chandler argues that these instructions allowed the jury to return a guilty verdict even if they found no connection between the enterprise and Chandler's solicitation of Shuler's murder.

Chandler failed to request a jury instruction concerning the charge he now claims was erroneous, nor did he object to the charge that was given. Thus, we review the charge for plain error. Fed.R.Crim.P. 52(b). The instructions are reviewed under the standard discussed above.[5]

---

5. *See supra* part III.A.2.

■ The instructions informed the jury that Count Three, the murder charge, was "built upon" Count Two, the continuing criminal enterprise charge. The district court also instructed the jury that there must be a connection between the murder and the continuing criminal enterprise. The connection was described once as "while engaged in and in furtherance of" the enterprise and later stated as "while engaged in or in furtherance of" the enterprise. RXIII–186, 187. There is nothing vague about this clear and direct expression. Additionally, the prosecution introduced evidence and argued repeatedly that Chandler had solicited the murder of Shuler because Shuler had informed on one of Chandler's dealers.

There is no reasonable likelihood that the jury believed that it could find Chandler guilty even if it found that he solicited Shuler's murder for reasons not connected to the continuing criminal enterprise. The instructions clearly conveyed to the jury that it must find a connection between Shuler's murder and the enterprise. The mere use of the word "or" by the district court once during the jury instructions is exactly the type of "artificial isolation" that the Supreme Court rejected in *Cupp v. Naughten.* 414 U.S. at 147, 94 S.Ct. at 400.

2. Violation of 18 U.S.C. § 3432

■ In any case in which a federal defendant is charged with a capital offense, at least three days before the commencement of trial, the prosecution must furnish the defendant with a copy of the indictment, a list of the veniremen and a list of the witnesses to be produced at the trial. 18 U.S.C. § 3432. On March 5, 1991, the government provided Chandler with a witness list. The list was supplemented on March 15, 1991.

The list did not include the name of Tim Whatley, a witness called by the prosecution. Whatley, an Anniston, Alabama, police offi-

cer, testified that in a search of Chandler's home he seized a piece of paper with the words "Bill Broome" and "copy of police report" on it.

Chandler contends that Whatley was improperly allowed to testify in violation of Section 3432. Chandler did not object when the government called Whatley as a witness, and objected to the admission of the piece of paper only on the grounds of "relevancy, materiality, and identification." RXI–36. Therefore, we review for plain error.

We first determine whether an error occurred and whether it was plain. The failure to include Whatley on the witness list was a technical violation of Section 3432, and it was an obvious error. Because this is an error that does not undermine the basic reliability of the trial process, Chandler must demonstrate that the error affected the outcome of the case.

Chandler cites *United States v. Crowell,* 442 F.2d 346, 348 (5th Cir.1971). In *Crowell,* the prosecution in a capital case did not provide the defendant with a list of the veniremen. The court held that "Section 3432 is mandatory, and a defendant indicted for a capital offense must be given the benefits of its provisions, and the failure to allow defendant its benefits would be plain error." *Id.* at 348 (citation omitted).[6]

We find that *Crowell* is distinguishable and that Chandler has not demonstrated that the error affected the outcome of his case. Chandler assigns as error the testimony of one police officer that the prosecution used to establish the chain of custody for the introduction of a piece of evidence. The officer's testimony was in no other respect important. Chandler makes no claim that his defense was in any way prejudiced by the failure to include Whatley's name on the government's witness list or that he was unaware that the government would attempt to introduce the

**6.** The *Crowell* court relied on two cases: *Amsler v. United States,* 381 F.2d 37 (9th Cir.1967), and *Logan v. United States,* 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892), *overruled by Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In *Amsler,* the prosecution in a capital case failed to provide the defendant with a list of either the veniremen or the prose-

cution's witnesses. In *Logan,* the government failed to provide the defendant with a list of witnesses. The Supreme Court in *Logan* stated that the predecessor statute to Section 3432 was "mandatory" and that "its purpose is to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defense." 144 U.S. at 304, 12 S.Ct. at 630.

piece of paper as evidence. Indeed, the government made the piece of paper available to Chandler pursuant to Fed.R.Crim.P. 16(a)(1)(C). Whatley had also written his name on the paper when it was seized. Thus, the purpose of Section 3432 as described in *Logan* was fulfilled because the defense was made aware that the government would attempt to link Chandler to the murder of Shuler in part through the piece of paper. Under the circumstances of this case, we find that the calling of Whatley as a witness for the government did not affect the outcome of Chandler's case.[7]

### 3. Lesser included offense

Chandler challenges the absence of an instruction to the jury that it could find Chandler guilty of the lesser included offense of the use of interstate commerce facilities in the commission of a murder for hire, 18 U.S.C. § 1958, an offense that does not carry the possibility of a death sentence. Chandler did not request the lesser included offense instruction and did not object to the district court's omission of such an instruction.

▬▬▬ The government may not statutorily preclude a defendant from seeking a lesser included offense instruction, if the evidence could support a finding of guilt on the lesser offense. *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). We have interpreted *Beck* as granting a defendant, who faces the possibility of a death sentence, the constitutional right to have a lesser included instruction read to the jury. *Rembert v. Dugger*, 842 F.2d 301, 303 (11th Cir.), *cert. denied*, 488 U.S. 969, 109 S.Ct. 500, 102 L.Ed.2d 536 (1988). In both *Beck* and *Rembert*, the defendant requested that the district court give a lesser included offense instruction. Here no such request was made.

The Court has also held that "[a]lthough the *Beck* rule rests on the premise that a lesser included offense instruction in a capital

case is of benefit to the defendant, there may well be cases in which the defendant will be confident enough that the State has not proved capital murder that he will want to take his chances with the jury." *Spaziano*, 468 U.S. at 456, 104 S.Ct. at 3160. Other circuits have held that when a defendant fails to request a lesser included offense instruction in a capital case, the district court does not err in failing to instruct on the lesser included offense. *Kubat v. Thieret*, 867 F.2d 351, 365–66 (7th Cir.), *cert. denied*, 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989); *Look v. Amaral*, 725 F.2d 4, 8–9 (1st Cir. 1984).

▬▬ We agree with the holding in *Kubat* that requiring a district court to give a lesser included offense instruction might be at odds with the trial strategy of defense counsel. Trial judges should be sensitive to and respectful of such difficult decisions made by counsel. Accordingly, we find that because Chandler did not request an instruction or object to the omission of an instruction for the lesser included offense of murder for hire, the district court did not err by failing to give such an instruction *sua sponte*.[8]

### 4. The offense in Count Three of the indictment

▬▬ Chandler argues that his conviction under Count Three of the indictment is invalid because Section 848(e) does not define an offense. Instead, Chandler submits that Section 848(e) is merely a sentencing provision that authorizes the death penalty without proscribing conduct.

The Fifth Circuit has squarely rejected this argument, and the reasoning of that court is persuasive. *United States v. Villarreal*, 963 F.2d 725, 727–28 (5th Cir.) (rejecting claim that Section 848(e)(1)(B) does not define an offense), *cert. denied*, —— U.S. ——, 113 S.Ct. 353, 121 L.Ed.2d 267 (1992). Section 848(e) sets forth the elements of the crime (any person engaged in a continuing

---

7. We further note that even had this error affected the outcome, the error does not seriously affect the fairness, integrity or public reputation of judicial proceedings, and we would not exercise our discretionary power to correct it. *See Olano*, —— U.S. at ——, 113 S.Ct. at 1779.

8. We do not reach the issue of whether a violation of 18 U.S.C. § 1958 is a lesser included offense of 18 U.S.C. § 848(e).

criminal enterprise who procures the intentional killing of an individual), the *mens rea* (intent), and a separate penalty (20 years imprisonment to life, or the death penalty). Similarly, the conduct proscribed in Section 848(e) is referred to as an offense in subsections (g), (h), (i), (j), (n), and (p). We find Chandler's argument meritless.

### 5. Appointment of additional counsel

■ Chandler challenges the district court's failure to inform him of his right to have a second attorney appointed on his behalf pursuant to either 18 U.S.C. § 3005 or 21 U.S.C. § 848(q)(4). The time sequence of events in this case foreclose Chandler's claims. On December 13, 1990, the original indictment, which did not contain a capital charge against Chandler, was returned. On December 20, 1990, the district court appointed counsel to represent Chandler. On January 7, 1991, L. Drew Redden entered his appearance as retained attorney of record for Chandler. The appearance was filed with the court on January 10. On January 9, the superseding indictment was returned against Chandler, which included the capital charge.

18 U.S.C. § 3005 states:

> [w]hoever is indicted for ... [a] capital crime shall be allowed to make his full defense ...; and the court ... shall immediately, upon his request, assign to him such counsel, not exceeding two, as he may desire....

Chandler did not request the appointment of counsel after the superseding indictment was returned. Therefore, the district court did not violate Section 3005.

Section 848(q)(4)(A) provides that a defendant who is charged with a crime punishable by death, but is financially unable to retain counsel, "shall be entitled to the appointment of one or more attorneys." By the time Chandler had been charged with a capital crime, he had already retained counsel. Therefore, the district court did not err in failing to appoint additional counsel under this section.

### C. Guilt Phase Challenges

Chandler assigns a number of errors to the guilt phase of trial that he claims require the reversal of all the convictions.

#### 1. Admission of evidence concerning threats towards, and disappearance of, Burrows and McFry

Chandler insists that the evidence concerning Chandler's threats against Patrick Burrows and Jeffrey McFry and their subsequent disappearance was improperly admitted during the guilt phase. Chandler argues that the evidence was irrelevant to the charges brought against him, and that its admission violated Fed.R.Evid. 404 and 403, and denied him due process. In effect, Chandler argues that the prosecution introduced this evidence in an attempt to demonstrate that Chandler was responsible for the deaths of these two individuals even though the government could not prove that they were in fact dead or, if they were, that Chandler had anything to do with their deaths.

■ The superseding indictment alleged that Chandler made threats against Burrows and McFry because he believed that they were stealing his marijuana. The indictment also alleged that after the threats were made, Burrows and McFry disappeared. Chandler moved to strike from the indictment both the alleged threats and disappearances. The magistrate judge stated that:

> Both parties announced satisfaction with the following ruling: The Government shall not inform the jury of the "disappearance" language that is contained within the paragraph cited. It is understood, however, that this shall not preclude the Government from offering evidence as to this.

RI–130. At a pretrial hearing held before the district court, the court, without objection, redacted the indictments to remove the allegations that Burrows and McFry had disappeared, but did not remove the allegations that Chandler had threatened Burrows and McFry.

During the trial, the government introduced evidence that Chandler suspected Burrows and McFry were stealing marijuana

from him, made threats against both Burrows and McFry, and announced that Burrows was dead and that McFry would be next. The government also introduced testimony that neither Burrows nor McFry had been seen since Chandler made these statements. Chandler objected to the introduction of testimony concerning the disappearance of Burrows and McFry once on hearsay grounds and once on unspecified grounds. However, after Chandler's hearsay objection, the prosecution reformulated the question and the witness testified that he had not seen Burrows since Chandler's threats, without objection by Chandler. The prosecution also introduced the testimony of another witness concerning the disappearance of McFry without drawing an objection from Chandler. At no time did Chandler object during trial and argue that the evidence concerning the disappearances of McFry and Burrows was improper for the reasons he now argues on appeal. Therefore, we review for plain error.

The evidence concerning Chandler's threats against Burrows and McFry is relevant to the charges that were brought against Chandler. Chandler was charged with supervising a continuing criminal enterprise whose goal was the trafficking of marijuana. Evidence is relevant if it has

> any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Fed.R.Evid. 401. Certainly, evidence that Chandler threatened individuals whom he believed were stealing marijuana and that they subsequently disappeared is relevant in proving that Chandler had a proprietary interest in a large marijuana operation. The obvious implication of such threats and disappearances is that Chandler had some personal stake that was affected by the marijuana thefts of Burrows and McFry. The threats and the disappearances also demonstrate Chandler's willingness to protect his marijuana operation through at least the threat of violence. The threats become more credible when viewed in conjunction with the disappearance of those he threatened.

■ The evidence does not violate Fed. R.Evid. 404. Rule 404 prohibits the introduction of propensity evidence; that is, evidence that demonstrates solely that, because the defendant engaged in some other "bad act," the defendant is likely to have engaged in the currently charged illegal act. *United States v. Dothard,* 666 F.2d 498, 501 (11th Cir.1982). However, Rule 404 does not proscribe evidence of criminal activity other than the charged offense "if it is an uncharged offense that arose out of the same transaction or series of transactions as the charged offense, if it was inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime of trial." *United States v. Weeks,* 716 F.2d 830, 832 (11th Cir.1983) (per curiam) (citations omitted). The evidence of Chandler's threats towards Burrows and McFry and their subsequent disappearances is an uncharged offense that arose from the same transaction as the charged offense. The evidence is also necessary to complete the story of the crime. The threats were actions taken by Chandler to further his marijuana trafficking operation, particularly where the credibility of the threats was enhanced by the disappearances. This evidence was properly admitted. *See United States v. Leavitt,* 878 F.2d 1329, 1339 (11th Cir.) (act in furtherance of conspiracy is not extrinsic evidence because it is necessary to complete story of the charged offense), *cert. denied,* 493 U.S. 968, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989).

■ The evidence also does not violate Fed.R.Evid. 403. Evidence may be excluded under Rule 403 only when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." However, we have cautioned, that Rule 403 is an extraordinary remedy that should be used only sparingly since it permits the trial court to exclude concededly probative evidence. *United States v. Terzado–Madruga,* 897 F.2d 1099, 1117 (11th Cir.1990). We see no reason to employ this sparing remedy. The evidence is probative in establishing Chandler's role in the conspiracy and criminal enterprise and in illuminating Chandler's attempt to protect his operation. Further, we find nothing "un-

fair" in the prejudice this evidence causes to Chandler. The evidence was properly admitted under Rule 403.

Finally, we reject Chandler's claim that the admission of this evidence denied him due process. Chandler relies on cases in which a verdict or sentence was based on material misinformation. *See Johnson v. Mississippi,* 486 U.S. 578, 590, 108 S.Ct. 1981, 1989, 100 L.Ed.2d 575 (1988); *United States v. Rodriguez,* 765 F.2d 1546, 1555 (11th Cir.1985). In the present case, Chandler has not shown that the jury was presented with any material misinformation. In fact, several witnesses testified concerning Chandler's threats and the disappearances of Burrows and McFry. The credibility of Chandler's remarks and his mode of operation were obviously enhanced by the knowledge of the disappearances of the two individuals.

In conclusion, the district court committed no error in admitting the evidence concerning the threats made by Chandler towards McFry and Burrows and their subsequent disappearances.

### 2. *Batson* challenge

Chandler contends that the prosecution impermissibly exercised its peremptory challenges by striking black jurors because of their race in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Chandler requests that the case be remanded so that the district court may conduct a hearing to establish the prosecution's motive for striking the black jurors from the panel.

The original venire contained 77 persons. After challenges for cause and other excuses, the venire contained 57 jurors, 13 of which were black.[9] The prosecution used 19 of its 20 peremptory challenges; 10 of the 19 were used to strike black jurors. The defense also struck one black juror. The jury that was empaneled contained two black members.

■ But Chandler did not object to the prosecution's strikes during *voir dire.* Chandler raised the *Batson* claim in his motion for

a new trial filed one week after the trial. The district court found the motion untimely and noted that Chandler had failed to make out a *prima facie* case of purposeful discrimination. We agree with the district court that Chandler's objection was untimely. The failure to make a timely *Batson* objection to the prosecution's use of peremptory challenges results in a waiver of the claim. *United States v. Cashwell,* 950 F.2d 699, 704 (11th Cir.1992). An objection is timely if it is made during *voir dire. Id.; see also, Clark v. Newport News Shipbuilding & Dry Dock Co.,* 937 F.2d 934, 938–40 (4th Cir.1991); *United States v. Dobynes,* 905 F.2d 1192, 1196 (8th Cir.), *cert. denied,* 498 U.S. 877, 111 S.Ct. 206, 112 L.Ed.2d 167 (1990); *United States v. Romero–Reyna,* 867 F.2d 834, 836–37 (5th Cir.1989). Chandler failed to object in a timely manner and thus waived his *Batson* claim.

### 3. Juror challenges for cause

Chandler contends that the district court erred in refusing to strike four jurors for cause. We review for an abuse of discretion, mindful that there are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion. *United States v. Tegzes,* 715 F.2d 505, 509 (11th Cir.1983).

■ A party challenging a juror for cause must demonstrate that the juror in question exhibited actual bias by showing either an express admission of bias or facts demonstrating such a close connection to the present case that bias must be presumed. *United States v. Khoury,* 901 F.2d 948, 955, *modified,* 910 F.2d 713 (11th Cir.1990). A juror who would automatically vote for the death penalty in every case must be removed for cause because that juror will fail to consider the aggravating and mitigating evidence as the instruction require her to do. *Morgan v. Illinois,* — U.S. —, —, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992).

Chandler argues that four jurors should have been removed for cause.

---

9. The government claims that there were 58 ju-

rors in the venire.

### a. Jurors Frye and Landers

█ Chandler argues that jurors Frye and Landers should have been excused because both indicated that they would impose the death penalty if Chandler was found guilty. Reading the entirety of their responses at *voir dire*, it does not appear that the district court abused its discretion by not striking these jurors for cause. The answers make it clear that while Frye and Landers were proponents of the death penalty, they would not automatically vote for the death penalty if they found Chandler guilty of murder.

█ Chandler also argues that Landers should have been removed for cause because he was *overheard telling other jurors* that "[t]he way to get off this case is to say the defendant looks guilty." RIV–312. Although informed of Landers's remark by the district court, defense counsel did not explore the statement during *voir dire* questioning of Landers. The district court held that this incident did not make it "totally improper" for Landers to serve on the jury and rejected Chandler's motion to strike Landers for cause.

Most jurors are aware that they can avoid jury duty by claiming a lack of impartiality. The statement does not demonstrate that Landers was biased against Chandler. Thus, the district court did not abuse its discretion in refusing to remove Landers for cause.

### b. Juror Tuggle

█ Chandler argues that juror Tuggle should have been excused because he was biased against drug activity. During *voir dire*, Tuggle stated that he had a son-in-law who was in jail because marijuana and possibly some other articles were found in his son-in-law's car. The juror's response to the district court's questions do not demonstrate that the Tuggle would be biased against a defendant prosecuted for marijuana distribution. Therefore, the district court did not abuse its discretion by refusing to remove Tuggle for cause.

### c. Juror Grimes

█ Chandler argues that juror Grimes should have been excused because she would not consider some of the statutory mitigating factors in reaching her conclusion on the appropriateness of sentencing Chandler to death. During *voir dire*, Grimes stated that she did not have strong feelings towards the death penalty one way or the other. However, she also stated that she did not believe that the defendant's age and past criminal history would affect her recommendation for or against a death sentence. Both of these factors are mitigating factors as defined in Section 848(m).

In *Morgan*, the Supreme Court asserted that:

> [a]ny juror to whom mitigating factors are likewise irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial.

—— U.S. at ——, 112 S.Ct. at 2235. Grimes's answers do not raise the primary concern of *Morgan;* that is, a juror who would automatically recommend a penalty of death regardless of any mitigating evidence. The statement that she would not consider two of the statutory mitigating factors was made in response to defense counsel's questions and in ignorance of the mandates of Section 848. Jurors are not expected to know the law prior to being properly instructed. More important, Grimes stated that she would follow the district court's instructions in arriving at her decision. The district court thus did not abuse its discretion in finding that Grimes would be able to follow the court's instructions.

In conclusion, we find that the district court did not abuse its discretion in refusing to excuse for cause these four jurors.

### 4. Recusal denied

█ Chandler argues that the district court erred in denying Chandler's motion for recusal. In an order denying Chandler's pretrial motion to strike the death penalty from the indictment, the district court stated:

> [b]ased on the evidence the court has heard during the trial of [Chandler's] co-defendants, this court is satisfied that the government has properly exercised prose-

cutorial discretion in not also seeking the death penalty for [Jarrell]. Jarrell was an alcoholic lackey for Chandler who for $500, or maybe simply a fifth of liquor, likely would have done anything Chandler directed him to do.

RI–201–3.

Chandler suggests that this holding demonstrates that the district court's lack of impartiality and the necessity of recusal. We review the district court's denial of a motion to recuse for an abuse of discretion. *McWhorter v. City of Birmingham*, 906 F.2d 674, 678 (11th Cir.1990) (per curiam).

▪ A judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The test under Section 455(a) is whether an objective, disinterested, lay observer fully ·informed of the facts on which recusal was sought would entertain a significant doubt about the judge's impartiality. *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir.1988), *cert. denied*, 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989). However, we have held that a "judge's bias must be personal and extrajudicial; it must derive from something other than that which the judge learned by participating in the case." *McWhorter*, 906 F.2d at 678. Likewise, a judge's rulings in a related case may not ordinarily serve as the basis for recusal. *Id.* There is an exception to this general rule when the movant demonstrates pervasive bias and prejudice. *Id.*

▪ In his order denying Chandler's motion, the district judge articulated that his comment concerning the relative culpabilities of Jarrell and Chandler was based on the evidence the court had heard during the trials of Chandler's co-defendants. This is the only comment cited by Chandler, and the comment was not extrajudicial. Moreover, although Chandler argues that the district judge's pervasive bias is demonstrated by the admission of evidence of uncharged and unproven crimes, his repeated denials of the defense's jury instructions, and his imposition of the maximum sentences possible for the non-capital convictions, these decisions are just a few of the many decisions that a

district judge is called upon to make in the course of a trial and fail to demonstrate pervasive bias and prejudice. Thus, the district judge did not abuse his discretion in denying Chandler's motion for recusal.

5. Change of venue and sequestration of the jury

Chandler claims that the widespread publicity before the trial prejudiced the jurors in his case. There were 64 articles in five different newspapers during the five months prior to trial. Some of the coverage suggested that Chandler was responsible for the deaths of McFry and Burrows. During *voir dire*, seven venirepersons stated that they had some knowledge of the case. Of the seven, six said that they would still afford Chandler a fair trial and the seventh did not remember what he had heard about the case. None of the seven were empaneled.

▪▪ The district court's denial of the motion for change of venue and for sequestration of the jury is reviewed for an abuse of discretion. *United States v. Lehder–Rivas*, 955 F.2d 1510, 1524 (11th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 347, 121 L.Ed.2d 262 (1992). Chandler alleges no facts, outside the press coverage mentioned above, showing that any of the jurors had been prejudiced by the pretrial publicity. Regarding the sequestration motion, the district court found that the publicity at that point was limited, but reserved the right to reconsider the motion if publicity increased later in the trial. We find that Chandler has not demonstrated that the publicity surrounding the trial was such that the district court abused its discretion in denying Chandler's motions for change of venue and for sequestration of the jury.

D. *Challenges To Convictions And Sentences On Other Counts*

1. Continuing criminal enterprise conviction, Count Two

Count Two of the indictment charged Chandler with engaging in a continuing criminal enterprise in violation of Section 848(a) by committing a series of violations of 21 U.S.C. §§ 841, 843(b) and 846. Chandler

argues that the district court's instruction erroneously suggested that district court had already determined Chandler's guilt on these charges. Upon review of the district court's charge, we disagree and find that the district court properly instructed the jury as to Count Two.

### 2. Conspiracy conviction, Count One

■ Chandler argues, and the government concedes, that his conspiracy conviction should be vacated. When a defendant is convicted and sentenced on a Section 846 conspiracy count and a Section 848 continuing criminal enterprise count, the two offenses are merged by vacating the conviction and sentence of the lesser included Section 846 conspiracy. *United States v. Nixon*, 918 F.2d 895, 908 (11th Cir.1990). We have sustained Chandler's continuing criminal enterprise conviction and, therefore, vacate Chandler's conspiracy conviction and sentence.

### 3. Firearms conviction, Count Four

■ Count Four charged Chandler with aiding and abetting the use or carrying of a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c). Chandler argues that there was insufficient evidence to support the jury's guilty verdict. Sufficiency of the evidence is a question of law subject to *de novo* review. *United States v. Poole*, 878 F.2d 1389, 1391 (11th Cir.1989) (per curiam). This court must view the evidence in the light most favorable to the government and determine whether a reasonable jury could have found defendant guilty beyond a reasonable doubt. *United States v. Crawford*, 906 F.2d 1531, 1535 (11th Cir.1990).

To prove a 18 U.S.C. § 924(c) violation, possession of the firearm must be an integral part of, and facilitate the commission of, the drug trafficking offense. *Poole*, 878 F.2d at 1393. At trial the government introduced evidence that Chandler recruited Raymond Pointer to transport marijuana from Piedmont, Alabama, to Anniston, Alabama, and provided Pointer with a car for that purpose. Pointer made three or four trips to Anniston. The prosecution then engaged in the following examination:

Q. Okay. And did you after you picked up this Oldsmobile, did you make any runs from Piedmont to Anniston with this Oldsmobile?

A. Yes, sir.

Q. Okay. Now, did you have an occasion on these runs to receive anything else from Ronald Chandler to keep with you on these runs?

A. Just that gun.

Q. Did he give you a gun?

A. Yes, sir.

Q. When did he give you a gun, as best you can recall?

A. I think it was two, maybe three days after he give me the car.

RVII–71–72.

■ Considering the testimony in its context, we find that there was sufficient evidence to support the Chandler's conviction on the firearm charge. The evidence, viewed in a light most favorable to the government, shows that Chandler gave Pointer a gun when Pointer was given the marijuana to transport to Anniston. A reasonable jury could have found beyond a reasonable doubt that the possession of the firearm was an integral part of, and facilitated, the drug trafficking, particularly in the context of other, substantial testimony at trial regarding the on-going criminal enterprise.

### 4. Money laundering, Count Seven

■ Chandler challenges the district court's instruction to the jury on Count Seven and seeks the reversal of his conviction. Count Seven charged Chandler with money laundering through the purchase of real estate in Cleburne County, Alabama. Count Eight charged Chandler with money laundering through the purchase of real estate in Calhoun County, Alabama. Chandler argues that the court charged the jury twice on Count Eight and did not charge the jury on Count Seven.

During the jury instructions, the district court incorrectly stated that the property charged in Count Seven was located in Calhoun County, Alabama. Shortly thereafter, the court correctly stated that the property was located in Cleburne County. The dis-

trict court also instructed the jury that Count Eight was "an identical-type offense as Count Seven" except that the date was different and the property in Count Eight was "in Calhoun County rather than Cleburne County." Significantly, the district court gave the jury a copy of the indictment, which accurately identified the property locations.

Chandler failed to object to the district court's instruction. Hence, the district court's error is reviewed for plain error. Given the district court's subsequent correct statement of the property's location and the fact that the jury received a copy of the indictment, the district court's instruction was not erroneous.

### 5. Money laundering, Counts Eight and Nine

■ Chandler contends that the evidence was insufficient to support the money laundering charges in Counts Eight and Nine. Counts Eight and Nine charged Chandler with money laundering through the purchases of two pieces of real estate. Both convictions are reviewed for sufficiency of the evidence under the standard set forth above.

The evidence at trial showed that Chandler's parents held the titles to both parcels. With respect to Count Eight, the government introduced evidence that Chandler paid taxes on the property and discussed drainage problems with municipal officials concerning the land. With respect to Count Nine, the government introduced evidence that, although his father paid the money to the sellers and received title to the land, Chandler stated that he had purchased the 120 acres. The evidence also showed that Chandler exercised control over the two properties by growing and cultivating marijuana on the properties and by having others guard the tracts. Viewed in the light most favorable to the government, there was sufficient evidence to support the jury's finding, beyond a reasonable doubt, that Chandler laundered money by purchasing the two real estate parcels.

### 6. Sentencing on the non-capital counts

Chandler first argues that we must remand the case to the district court for resentencing because the district court failed to afford him a sufficient opportunity to object to the sentence as required under *United States v. Jones,* 899 F.2d 1097, 1102–03 (11th Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990). However, after imposing the sentences, the district court specifically asked counsel if there were any objections other than those that had been raised during the sentencing hearing. Chandler's claim is without merit.

Chandler also argues that the district court improperly calculated his offense level on the conspiracy and continuing criminal enterprise counts. Since we have vacated Chandler's conviction on the conspiracy count, we address only the challenge to the criminal enterprise sentence. At sentencing, the district court adopted the presentence report's recommendation for the offense level on the continuing criminal enterprise counts. The report noted that the offense level for these counts is 38. U.S.S.G. § 2D1.5. However, the report stated that the offense level should be adjusted to take into account relevant conduct with respect to the enterprise pursuant to Section 1B1.3. The relevant conduct was the murder of Shuler. Thus, as Section 2A1.1(a) assigns an offense level of 43 to first degree murder, Chandler's offense level was fixed at 43, resulting in a life sentence.

Chandler contends that the district court's computation resulted in the double counting of Shuler's murder, once in the continuing criminal enterprise count and again as the basis for the death sentence under the Section 848(e) count, Count Three. Under the circumstances of this case, we do not reach the merits of Chandler's claim. He faces a sentence of death on Count Three, and the life sentence on Count Two adds no further punishment.

■ Finally, Chandler argues that the district court erred in holding that the drug activity encompassed in the conspiracy and continuing criminal enterprise counts included more than 3,000 but less than 10,000 marijuana plants. We review the district court's findings of fact under the clearly erroneous standard. *United States v. Howard,* 923 F.2d 1500, 1503 (11th Cir.1991). During the trial, witnesses testified that Chandler

planted several thousand marijuana plants. A notebook seized from a co-conspirator and Chandler's own statement also supported the finding that Chandler planted more than 3,000 marijuana plants. Thus, the district court's finding that Chandler cultivated more than 3,000 marijuana plants was not clearly erroneous.

## IV. CONCLUSION

We **VACATE** Chandler's conviction and sentence for conspiracy, Count One, because the count merges into the continuing criminal enterprise conviction, Count Two. We **AFFIRM** Chandler's convictions and sentences on Counts Two through Nine, including his death sentence.

EDMONDSON, Circuit Judge, concurs in the result.